*State of New York*
*Supreme Court, Appellate Division*
*Third Judicial Department*

Decided and Entered:  February 25, 2016              519472
_____

In the Matter of LEV WOLKOWICKI
    et al.,
                      Petitioners,

        v                                   MEMORANDUM AND JUDGMENT

NEW YORK STATE TAX APPEALS
    TRIBUNAL et al.,
                      Respondents.
_____

Calendar Date:   January 8, 2016

Before:   Peters, P.J., Garry, Egan Jr., Devine and Clark, JJ.

                    _____

        Law Office of Barry Leibowicz, Great Neck (Scott Ahroni of counsel), for petitioners.

        Eric T. Schneiderman, Attorney General, Albany (Robert M. Goldfarb of counsel), for Commissioner of Taxation and Finance, respondent.

                    _____

Egan Jr., J.

        Proceeding pursuant to CPLR article 78 (initiated in this Court pursuant to Tax Law § 2016) to review a determination of respondent Tax Appeals Tribunal sustaining sales and use tax assessments imposed under Tax Law articles 28 and 29.

        At all times relevant, petitioner Winners Garage, Inc. was a taxicab agent licensed by the New York City Taxi and Limousine Commission (hereinafter TLC) that operated a fleet of New York City medallion taxicabs.  Petitioner Ruth Wolkowicki was the president and 100% shareholder of Winners Garage, and petitioner Lev Wolkowicki was its vice-president.  Winners Garage owned or

managed the taxicabs and leased the medallions from their respective owners; in turn, Winners Garage leased the taxicabs and re-leased the medallions, attached to the taxicabs, to individual drivers.  The taxicab leases were subject to state sales tax, while the medallion leases were not.

By letter dated February 5, 2004, the Audit Division of respondent Department of Taxation and Finance notified Winners Garage that its sales and use tax records — encompassing the period from March 1, 2001 through November 30, 2003 — had been scheduled for a field audit beginning on March 1, 2004.[1]  This letter expressly provided that "[a]ll books and records pertaining to the sales and use tax liability, for the audit period, must be available on the appointment date."  Attached thereto was a list of requested records, which included the corporation's sales tax returns, federal income tax returns, state corporate tax returns, general ledger, general journal, sales invoices, fixed asset purchase/sales invoices, expense purchases and bank statements.  At the bottom of the list of requested records, in bold type, was the following notation: "Any of the above items may be submitted in electronic format, if available, and this may facilitate the audit process."

The audit subsequently was reassigned to auditor David Perl, who, by letter dated February 26, 2004, confirmed the rescheduled audit appointment for March 16, 2004.  This letter reiterated that "[a]ll books and records pertaining to the sales and use tax liability, for the audit period, must be available on the appointment date" and, attached thereto, was a list of requested records.  Notably, the list of requested records attached to this letter expressly requested copies of leases for the entire audit period, as well as computer generated files — for the entire audit period — that were identical to the books and records maintained by the corporation.  At the request of Winners Garage, the audit was postponed until May 3, 2004.  Perl confirmed the rescheduling of the audit in a letter dated March 2, 2004, at which time Winners Garage was advised that, in

_____

[1]  The audit period subsequently was amended to include sales and use tax records through February 29, 2004.

addition to the previously requested documents, it would be required to produce materials relative to its sales and use tax liability for the amended audit period.  Again, a list of requested records was attached to this letter.

When the audit began on May 3, 2004, Winners Garage made certain books and records available to Perl and his supervisor, including sales tax worksheets, federal income tax returns for 2001 and 2002, bank statements for a portion of the audit period, a printout of the corporation's computerized general ledger's revenue accounts for December 5, 2003 through January 7, 2004, the daybook for that same period and the medallion leases for December 1, 2003 through February 29, 2004.  In his follow-up letter dated May 4, 2004, Perl suggested that a test period of December 1, 2003 through February 29, 2004 be used for reviewing the corporation's expense invoices and scheduled a second audit appointment for June 3, 2004.  Perl further advised Winners Garage that certain requested materials still were required for the audit, including, among other things, bank statements and lease contracts for the drivers.[2]

The scheduled audit was postponed — again at the request of Winners Garage — until July 7, 2004, at which time some, but not all, of the records set forth in the May 2004 letter were produced and reviewed.  With respect to the drivers' leases, Perl testified that the records maintained by Winners Garage indicated that 75 cars were leased during the test period of December 1, 2003 through February 29, 2004; of those 75 lease contracts, only 18 of these agreements were provided for Perl's review.  When questioned on this point, Perl indicated that he was advised by a representative of Winners Garage that it "would take . . . too much time" to produce all 75 leases and "just to do 18."  As to the sufficiency of the 18 lease contracts provided, Perl testified that he "did not see a single contract that could be considered . . . an adequate contract" for purposes of the

_____

[2]  Perl also suggested a test period of December 1, 2003 through February 29, 2004 for review of the drivers' leases.

underlying audit.[3]

By letter dated November 17, 2004, Perl scheduled a third field audit appointment for December 21, 2004. In this letter, Perl again advised Winners Garage of the outstanding records needed for the sales tax audit, including certain bank statements and, more to the point, the lease contracts for the drivers. In this regard, the letter indicated, "To date, [Winners Garage has] provided approximately one fifth of [the] lease contracts for the suggested test period of [December 1, 2003 through February 29, 2004]. We must review all contracts for the test period (if not for the audit period as a whole)." Neither the subject bank statements nor the requested lease agreements were produced at the scheduled audit appointment, as a result of which Perl was unable to determine, among other things, whether the lease agreements between Winners Garage and the drivers were long-term leases (see Tax Law § 1111 [i] [A]) for purposes of the special tax on passenger car rentals imposed under Tax Law § 1160 (a) (1).

Perl ultimately concluded that the records provided by Winners Garage were inadequate to conduct a complete audit; as a result, Perl resorted to external sources to conduct an estimated audit to determine whether the correct amount of sales taxes owed by Winners Garage for the audit period had in fact been paid. In early 2005, the Department issued a notice of determination to Winners Garage reflecting additional sales and use taxes due in the amount of $299,865.48, together with interest and penalties.

---

[3] Perl elaborated as to the inadequacy of the lease agreements, stating, "There were names missing, signatures missing. There was never a single instance when a contract [indicated when it] was supposed to begin and when it was supposed to end. Most of them did not show dollar amounts[,] never mind how much was to be taxable, how much was to be nontaxable. No information at all. There was no information. Most of them didn't say the owner of the medallion, just put the medallion number on it without saying who was actually the owner of the medallion. So there was no way to trace that information. Most [leases] did not have signatures."

The Department also issued notices of determination to Lev Wolkowicki and Ruth Wolkowicki, as officers or responsible persons of Winners Garage, for additional sales and use taxes due in the amount of $217,491.23, together with interest and penalties.

Petitioners contested the notices of determination, and a consolidated hearing was held on various dates between July 1, 2008 and December 3, 2009. During the course of the hearing, petitioners submitted, among other things, copies of 140 purported lease agreements between Winners Garage and their drivers, together with affidavits from 47 drivers who allegedly leased "taxicab vehicles from medallion owners or vehicle owners managed by Winners [Garage]." In August 2011, an Administrative Law Judge (hereinafter ALJ) issued a written decision sustaining the notices of determination. Specifically, the ALJ found, among other things, that the Division made "clear and unequivocal written requests for books and records of Winners Garage's sales," in response to which Winners Garage "did not make available sales books and invoices, all contracts with drivers, complete bank statements or other source documentation from which the auditor could verify Winners Garage's taxable sales as reported on the sales and use tax returns." For this reason, the ALJ found, "[t]he Division reasonably concluded that the books and records provided for the audit period were incomplete and inadequate to . . . conduct a complete audit from which the exact amount of tax due could be determined" and, hence, "it was proper for the Division to resort to the use of external indices" to compute the tax due. As to the actual methodology employed, the ALJ concluded that petitioners failed to establish — by clear and convincing evidence — that the audit method was unreasonable or that the amount of tax assessed was incorrect. Finally, the ALJ upheld the 5% special tax on passenger car rentals imposed by Tax Law § 1160 (a) (1),[4] finding that petitioners failed to document that the underlying leases with the drivers were for a term of

_____

[4]  Effective June 1, 2009, Tax Law § 1160 (a) (1) increased the tax imposed on passenger car rentals from 5% to 6% as applied to transactions on or after that date (see L 2009, ch 57, part R-1, §§ 1, 2, 3).

one year or more (see Tax Law § 1111 [i] [A]).  Following oral argument in October 2013, respondent Tax Appeals Tribunal affirmed the ALJ's decision in April 2014, prompting petitioners to commence this CPLR article 78 proceeding to challenge the Tribunal's determination.

With certain limited exceptions not applicable here, Tax Law § 1105 (a) imposes sales tax upon "[t]he receipts from every retail sale of tangible personal property."  A retail sale is defined, in relevant part, as the "sale of tangible personal property to any person for any purpose" (Tax Law § 1101 [b] [4] [i]) and encompasses "any transaction, including a lease, in which there is a transfer of title or possession or both of tangible personal property for consideration" (Matter of Moerdler v Tax Appeals Trib. of State of N.Y., 298 AD2d 778, 779 [2002]; see Tax Law § 1101 [b] [5]; Matter of Statharos v Tax Appeals Trib. of State of N.Y., 306 AD2d 650, 651 [2003]).  As applied to the matter before us, the agreements whereby Winners Garage leased taxicabs to drivers constituted taxable retail sales (see Matter of Statharos v Tax Appeals Trib. of State of N.Y., 306 AD2d at 651), whereas the leases of the medallions, representing an intangible right to operate a taxicab in New York City, were not.

Consistent with the provisions of Tax Law § 1135, "[e]very person required to collect tax shall keep records of every sale . . . and of all amounts paid, charged or due thereon and of the tax payable thereon" (Tax Law § 1135 [a] [1]) and, further, must make such records "available for inspection and examination at any time upon demand" (Tax Law § 1135 [g]; see Matter of Rodriguez v Tax Appeals Trib. of the State of N.Y., 82 AD3d 1302, 1304 [2011], lv denied 17 NY3d 702 [2011]; 20 NYCRR 533.2).  Upon an audit of a taxpayer's transactions, the Division is required to request appropriate records and undertake "a sufficient investigation" thereof in order to determine whether such materials are capable of supporting a complete audit (Matter of King Crab Rest. v Chu, 134 AD2d 51, 53 [1987]).  Should the records produced by the taxpayer prove to be insufficient "to verify taxable sales receipts and conduct a complete audit" (Matter of Giordano v State Tax Commn., 145 AD2d 726, 727 [1988]), the Division may rely upon "external indicies" to

estimate the correct amount of tax due (Tax Law § 1138 [a] [1]; accord Matter of MacLeod v Megna, 75 AD3d 928, 930 [2010]; Matter of Del's Mini Deli v Commissioner of Taxation & Fin., 205 AD2d 989, 991 [1994]).  Where, as here, an indirect audit method has been employed, "the taxpayer challenging such an audit has the burden of establishing by clear and convincing evidence that the audit method or tax assessment was erroneous" (Matter of Hwang v Tax Appeals Trib. of the State of N.Y., 105 AD3d 1151, 1153 [2013] [internal quotation marks, brackets and citation omitted]; see Matter of Roebling Liqs. v Commissioner of Taxation & Fin., 284 AD2d 669, 672 [2001], appeal dismissed 97 NY2d 637 [2001], cert denied 537 US 816 [2002]; Matter of Del's Mini Deli v Commissioner of Taxation & Fin., 205 AD2d at 991).

Petitioners initially contend that the Division failed to adequately request and review the books and records kept by Winners Garage — specifically, any electronic records so maintained — and, therefore, improperly resorted to the use of an indirect audit method to ascertain the sales and use tax due.  We disagree.  Without belaboring the point, suffice it to say that the Division — as evidenced by its February 5, 2004 and February 26, 2004 letters and the lists of requested records attached thereto — indeed advised petitioners that any of the requested documents "may be submitted in electronic format" and, further, expressly requested the production of any "Computer Generated Files That Are Identical to Books and Records for [the] entire audit period."  Thus, petitioners' primary premise — that the Division never sought to review any of the computerized records maintained by Winners Garage — is belied by the record.

Petitioners' related assertion — that the Division failed to request all of the documents necessary to conduct a proper audit of Winners Garage's taxicab business — is equally unavailing.  Correspondence contained in the record on review — specifically, letters from Perl dated May 4, 2004 and November 17, 2004 — reflects that Winners Garage was expressly advised of the particular documents that still needed to be produced in order to complete the sales tax audit, including copies of the lease agreements for the drivers.  As evidenced by both the documentary evidence and Perl's hearing testimony, petitioners did not even come close to complying with the Division's document

requests — particularly with respect to the subject taxicab leases. In this regard, the record fully supports the Tribunal's finding that "[t]he 18 driver contracts were the only source documents of taxicab rentals provided [by Winners Garage] to the Division on audit," and Perl's testimony reflects that — as noted previously — key terms and provisions, such as lease term dates and stated rates, were missing from each of the 18 contracts provided. Although Perl apparently did not make a list of the 18 specific contracts reviewed, during the course of the administrative hearing, petitioners submitted copies of contracts for 140 taxicab drivers — all of which suffered from a variety of infirmities similar to those identified by Perl relative to the 18 contracts produced for his review. Specifically, although each of the 140 contracts tendered stated that it was for a 53-week period, none of those documents bore a starting or ending date for the lease term or identified the vehicle being leased,[5] and only one of the contracts set forth the weekly rental rate to be paid by the driver. Additionally, a substantial number of the contracts were missing other pertinent information — such as the driver's name, the owner of the medallion and/or the driver's signature. Under these circumstances, we have no quarrel with the Tribunal's finding that, "given the limited records provided in response to the Division's requests," resort to an indirect audit methodology was entirely appropriate.[6]

Petitioners' further claim — that the audit method employed by the Division was not reasonably calculated to reflect the taxes due — is equally unpersuasive. The Division employed a method previously negotiated by the Metropolitan Taxicab Board of

_____

[5] Notably, each lease provided that it "cover[ed] all cars driven by [t]he [d]river" and, hence, the individual contracts could not be linked to the lease of a particular vehicle.

[6] To the extent that petitioners contend that they never consented to the test period utilized by Perl, the conflicting testimony on this point presented a credibility issue "for the taxing authority to resolve" (Matter of Brahms v Tax Appeals Trib., 256 AD2d 822, 825 [1998]; see Matter of Rubin v Tax Appeals Trib. of State of N.Y., 29 AD3d 1089, 1092 [2006]).

Trade and the Division and thereafter adopted by the Tribunal (see Matter of Statharos v Tax Appeals Trib. of State of N.Y., 306 AD2d at 651-652). This method utilizes a fair market rental value for a taxicab for a 12-hour shift of $24 and a 16.40% allowance for taxicab downtime – multiplied by two shifts per day, seven days per week and 13 weeks per quarter. Using records obtained from the TLC, the Division then multiplied the resulting number by the number of medallions managed by Winners Garage during each of the relevant quarters – 85 during the first six quarters and 77 during the last six quarters. The Division further assessed the 5% special tax imposed on passenger car rentals set forth in Tax Law § 1160 (a) based upon petitioners' failure to demonstrate that the underlying taxicab leases were for a period of one year or more (see Tax Law § 1111 [i] [A]).

Petitioners' objections to the challenged audit method primarily are directed to the specific components thereof, i.e., utilizing the number of medallions obtained from the TLC to estimate the number of taxicabs leased during the relevant period and utilizing the industry standard of 16.40% to compute taxicab downtime. Simply put, inasmuch as petitioners failed to produce sufficient records – including complete copies of the drivers' leases – from which the Division could determine the actual number of taxicabs leased during the period at issue, petitioners cannot now be heard to complain that the Division resorted to external indicies, including records maintained by a disinterested third party (see Matter of MacLeod v Megna, 75 AD3d at 930-931), in order to calculate the tax due. Nor did petitioners establish – by clear and convincing evidence – that either the shift rental rate of $24 or the industry allowance for downtime of 16.40% was erroneous. Finally, given the infirmities previously identified in the drivers' contracts, including the absence of a stated lease term, petitioners failed to establish that the subject leases were long-term leases within the meaning of Tax Law § 1111 (i) (A) and, hence, the 5% special tax set forth in Tax Law § 1160 (a) (1) was properly imposed.

The case law makes clear that "the Tribunal's determination will be confirmed if it is rationally based upon and supported by substantial evidence" (Matter of Ingle v Tax Appeals Trib. of the Dept. of Taxation & Fin. of the State of

N.Y., 110 AD3d 1392, 1393 [2013] [internal quotation marks and citation omitted]; see Matter of Salh v Tax Appeals Trib. of the State of N.Y., 99 AD3d 1124, 1125 [2012], lv denied 20 NY3d 863 [2013]).  Upon reviewing the record as a whole, we are satisfied that this evidentiary standard was met here.  Petitioners' remaining contentions, including their claim of auditor bias and their challenge to the penalty imposed, have been examined and found to be lacking in merit.

Peters, P.J., Garry, Devine and Clark, JJ., concur.


ADJUDGED that the determination is confirmed, without costs, and petition dismissed.


ENTER:

Robert D. Mayberger
Clerk of the Court